**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00267-CRC** |
| **v.** | : | |
| | : | |
| **BRYAN WAYNE IVEY,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Bryan Wayne Ivey to 14 days of incarceration and three years of probation with mandatory psychological treatment and $500 in restitution.

**I.      Introduction**

The defendant, Bryan Wayne Ivey, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

Ivey pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a short period of incarceration followed by three years' probation is appropriate in this case because (1) the defendant observed violence against law enforcement officers; (2) the defendant was present when the window adjacent to the Senate Wing Door was smashed with a riot shield; (3) the Defendant then entered through that

window and was one of the very first rioters to unlawfully enter the U.S. Capitol; (4) the Defendant spent 35 minutes in the Capitol; and (5) the defendant inaccurately minimized his conduct in his FBI interview and deleted photos and videos from his cell phone after the riot.

The government recognizes that the defendant did not personally engage in violence or property destruction, which would have resulted in felony charges. However, even though Ivey did not engage in the violence necessary to overcome the police line on the West Terrace, he stood by and watched the rioters overwhelm the police, choosing to then voluntarily advance towards the Capitol Building after the police line was violently breached. Ivey then stood by and watched while Dominic Pezzola[1] smashed through a window of the U.S. Capitol using a stolen riot shield. Again, he did not retreat, but instead chose to climb *through the window* to unlawfully enter the U.S. Capitol. Having entered the Capitol, he then approached the Senate door and, in Capitol CCV, appears to wave other rioters inside. While the defendant protests that he was actually intending to exit the Capitol, the video displays him standing at the door and seemingly gesturing towards other rioters. While Ivey claims that he immediately intended to exit the Capitol, this assertion is belied by the fact that he then spent 35 minutes in the Capitol before finally leaving.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the defendant was one of the very first rioters to engage in the transgressive act of unlawfully entering the Capitol through a window. There can be no question that his willingness to do so inspired others around him to do the same and contributed substantially to the subsequent flood of rioters who streamed

---

[1] *See United States v. Pezzola et al.*, 21-cr-52-TJK (DDC)

in through the Senate Wing door. According to Ivey, his conduct was the result of paranoid and delusional thinking patterns.  He indicates that he no longer suffers from those destructive thought patterns and has expressed remorse; however, the Defendant also indicates that he currently suffers from significant mental illness that has been exacerbated by the criminal investigation, as described in his sealed psychological evaluation.  Accordingly, the government is recommending 14 days' incarceration and three years' probation with the mandatory condition of psychological treatment.

## II.  Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at ¶¶ 1-9. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### Bryan Ivey's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Bryan Ivey traveled to Washington, D.C., with his wife and brother-in-law to attend the "Stop the Steal" rally. Ivey did not attend the rally itself and instead joined a large crowd advancing on the U.S. Capitol. Ivey stood at the front lines of a large crowd pressing against a police perimeter comprised of bike racks:



*Screenshot of Ivey standing at police perimeter*

The government found no evidence that Ivey was involved in physically overpowering the police attempting to maintain this perimeter. After the police line and metal barricades were breached, Ivey advanced towards the Senate Wing Door. Ivey stood by and watched while Dominic Pezzola smashed through an adjacent window using a police riot shield. Ivey can be seen in Exhibit 1, standing by and videotaping while Pezzola smashes through the window. *See* Exhibit 1; Statement of Offense ¶ 10. In Exhibit 1, Ivey can be heard yelling "they're breaking the windows!" while he records with his cell phone.



*Still from Exhibit 1*



*Still from Exhibit 1*

Ivey then entered through the breached window. He was the fourteenth person to unlawfully enter the U.S. Capitol at the Senate Wing Door. *See* Exhibit 2 (U.S. Capitol CCV video of Senate Wing Door).



*Still from Exhibit 2*

Once inside, Ivey watched other rioters kick open the Senate Wing Door from inside of the breached Capitol. Ivey appears to be recording on his cell phone for the entire duration of his unlawful entry into the U.S. Capitol.



*Still from Exhibit 2*

Ivey can be seen on video seemingly waving additional rioters into the Capitol Building.



*Still from Exhibit 2*

Ivey spent at least 35 minutes inside of the Capitol building, the vast majority inside of the Rotunda. U.S. Capitol CCV shows Ivey recording multiple videos during this time. Video obtained from Parler also reveals Ivey in the Rotunda and seemingly recording video.



Ivey, however, deleted all of the photos and videos from his cell phone from both outside of and inside of the U.S. Capitol on January 6. *See* Statement of Offense ¶ 12.

*Bryan Ivey's Interview*

Ivey voluntarily agreed to be interviewed by the FBI at the time of his arrest. He also gave consent to search his car. He was cooperative with the FBI agents, but he minimized his conduct and made a number of claims that are not supported by the evidence uncovered during the investigation.

At the outset, Ivey told the FBI, "I would like to tell you what happened… I'm a little emotional, stuff got f***ed up pretty quick. I was there and I don't even know what the f*** happened[.]" Ivey told the FBI that "the situation was just starting to fall apart and it was becoming like a natural disaster or something, it was f***ing crazy[.]"

Ivey explained that he was a miner, a tugboat operator, and an excavator operator who worked hard and took very few days off. He believed that the rally would be like the civil rights march in the 1950s and would be a "noble, great day." Ivey traveled to Washington, D.C. with his wife and his brother. He told the FBI that he arrived late, he saw people walking, and he followed them. Ivey attempted to get to the speech but couldn't get close. He described a packed crowd of people moving up the stairs of the Capitol. He described watching people fight with cops and getting "rowdy." Ivey claimed that he witnessed someone hit in the face with a projectile and that he attempted to render aid with a medical kit that he brought.  After this, Ivey stated that he became separated from his brother and that the crowd started shoving people "super hard" and forcing them up the stairs and up the hill.

Ivey claimed that he was getting crushed and that the crowd then broke open and dropped him out onto the grounds of the Capitol where a "huge guy" was trying to break a window with a two-by-four. Ivey claimed that he tried to stop that man from breaking out the window. At that point, according to Ivey, another large man ran up with a police shield and started beating out the

window behind him. Ivey claims that he yelled to try to get help to stop him. Exhibit 1 does show Ivey yelling "they are breaking the windows!" although the video, which captures only a short period of time, does not capture Ivey attempting to stop anyone. Ivey described the window being broken out and people pouring through the windows. According to Ivey, he couldn't go any other way and so he went through the window. At that point, "things really got crazy" including "a dude pissing on a statue[.]" Ivey claims that he yelled at other rioters to stop breaking things. The government has no evidence that Ivey exhorted other not to break things. If this happened, it would have been captured on the cell phone video which Ivey recorded and which he also deleted.

Ivey described that when he tried to exit out the front door that people were pouring in and it was "like trying to climb up a waterfall[.]" Ivey told the FBI that he thought if he stayed on the right wall that he would find an exit. Ivey quickly became lost, claims he asked the police how to get out, found a door that people were streaming into, and even considered breaking a window to leave. Ivey described encountering an older couple, at which point Ivey described being crushed in a doorway. Ivey claims he took the older woman by the hand and walked through the building with her, eventually encountering her husband. Ivey describes attempting to exit with this older couple and eventually finding an exit. Capitol surveillance footage identified by the FBI does not show Ivey in the Capitol with an older couple, nor does it show Ivey asking police officers how to leave the Capitol. However, there are several time-breaks in the identified surveillance footage and these events could have occurred during the breaks in footage. Instead, the Capitol surveillance footage captures Ivey spending at least 15 minutes wandering around the Rotunda from approximately 2:33 PM until approximately 2:48 PM when he finally exits the Rotunda. While in the Rotunda, Ivey does not appear to be making any efforts to leave and is

instead documenting his trespass with his cell phone – creating a video that he later deleted prior to being arrested.

Ivey told the FBI that he was inside for five to ten minutes but said that "everything f***ing escalated quickly[.]" In fact, the Capitol surveillance shows that Ivey was in the U.S. Capitol from 2:13 PM until at least 2:48 pm, for a total of at least 35 minutes. With respect to the riot, Ivey described that "from far away it didn't look that serious but up close it really looked like the end of the world[.]"

After exiting, Ivey found his wife and they immediately left the city.

When asked about photos and videos, Ivey admitted to taking a video on his phone while inside the Capitol but admitted to deleting everything on his phone.

Ivey told the FBI that he "genuinely did not know there were Congressman and Senators and sh** in the building when that was going on[.]" He claimed that there were no signs, no fences, and nobody giving orders to disperse outside of the Capitol. This is not accurate. Indeed, before ascending to the Senate Wing Door, Ivey stood at a very clear police line, in front of a line of riot-clad police officers on the other side of metal barricades that served as a fence:



*Screenshot of Ivey standing at police perimeter*

Finally, Ivey told the FBI that he did not travel to Washington, D.C., with cruel or malicious intent.

*The Charges and Plea Agreement*

On March 3, 2021, Ivey was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On March 4, 2021, he was arrested at his home in Tennessee. On March 31, 2021, Ivey was charged by four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On June 22, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in the Capitol Building. By plea agreement, Ivey agreed to pay $500 in restitution to the Department of the Treasury.

## III.     Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, §

3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, consideration of all of the Section 3553(a) factors weighs in favor of a short term of incarceration and a lengthy term of probation with mandatory psychological treatment.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the

defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants.  The defendant's lack of violence and property destruction explains why he was charged only with, and permitted to plead to, a misdemeanor rather than felony.

Ivey was one of the very first rioters to enter the U.S. Capitol and he did so by climbing through a window that he had just watched be smashed with a two-by-four and a riot shield.  While the government has no evidence that Ivey encouraged violence or property destruction, he admitted to observing violence against law enforcement and yet he still advanced towards the U.S. Capitol. He further watched the U.S. Capitol breached through a window and yet still decided to enter the Capitol through that same window.

U.S. Capitol CCV shows extensive footage of the defendant seemingly recording the riot with his cell phone, but the defendant deleted all of the photos and videos taken outside and inside of the Capitol prior to his arrest. The deleted footage likely included inculpatory information. The footage may also have corroborated some of his exculpatory assertions including claims that he was seeking an exit and attempting to assist an elderly couple.

Although the defendant told the FBI that he immediately tried to exit the Capitol, he in fact spent approximately 35 minutes in the Capitol. However, he spent the vast majority of that time in

the Rotunda. There is no evidence that Ivey sought out more sensitive areas of the Capitol such as members' personal offices or the Senate chamber.

The defendant was cooperative with the FBI upon his arrest. While he did not precisely express contrition, he did describe a chaotic environment that was well beyond what he intended to participate in. Further, Ivey was one of the first defendants to plead guilty in these cases. As detailed in the PSR and the sealed psychological evaluation, the defendant has since repeatedly expressed remorse. The defendant has also expressed remorse through counsel. It is, however, difficult to discern the weight to be properly given to post-arrest expressions of remorse. As Judge Chutkan observed in *U.S. v. Mazzocco,*

> But Mr. Mazzocco's remorse -- and I believe his remorse is sincere -- Mr. Mazzocco's remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.

*United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30.

Ivey was one of the very first people to unlawfully enter the U.S. Capitol and he did so through a window that had been breached with a riot shield and a two-by-four. There can be no doubt that his unlawful entrance in that manner emboldened other rioters and contributed to the flood of rioters who entered through the Senate Wing Door. *See id.* at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).  His subsequent destruction of the significant photo and/or video footage of the events of the Capitol must also be considered. However, while Ivey spent approximately 35 minutes in the Capitol, he stayed largely in the Rotunda and the government has no evidence that he

engaged in the promotion of violence or destruction of property. Accordingly, on balance, the nature and the circumstances of this offense weigh in favor of a short period of period of incarceration.

### B.   The History and Characteristics of the Defendant

Ivey has a minor criminal history of merchant theft of a wireless speaker, resulting in a probation, and driving on a suspended license. Ivey has maintained a long history of employment and is currently employed.

Bryan Ivey also suffers from substantial mental health challenges and endured childhood abuse, as set forth more fully in the PSR and the psychological evaluation filed under seal. He has also admitted to significant and extensive delusional beliefs that gave rise to his participation in the January 6 riot. Ivey has admitted that prior to the riot he was in a "slightly delusional state." This included believing that the Illuminati controlled the world, and that President Trump was selected by the military to stop the New World Order and prevent mass extermination of the human population. Ivey was convinced that government officials were abusing children and were plotting to round up and commit mass executions of civilians. Ivey's prior delusional beliefs are described in further detail in the sealed psychological evaluation.

There is a very clear and immediate need for psychological treatment and intervention in this case. This weighs in favor of a short period of incarceration and a lengthy term of probation that incorporates mandatory psychological treatment.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

16

democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing); *see also United States v. Matthew Mazzocco,* 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.") (statement of Judge Chutkan). The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

It is not clear whether this defendant is in need of specific deterrence. On one hand, Ivey has admitted remorse and asserted that he no longer believes the conspiracy theories that led him

to the Capitol in the first instance. That, combined with his lack of serious criminal history, suggests that there is not a great need for specific deterrence in this case. On the other hand, the defendant is clearly susceptible to delusional thinking, which led him to the crimes for which he is now being sentenced. This raises the concern that if presented with a similar conspiracy theory that he might engaged in the same unlawful activity. That said, on balance, this defendant is probably in greater need of psychological treatment than specific deterrence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[3] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[4] Indeed, the government invites

---

[3] Attached to this supplemental sentencing memorandum is a table, Exhibit 3, providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[4]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Dona Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF).  The government is abiding by its agreements in those cases but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a

the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The defendant has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building on the Capitol grounds, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as the analysis below illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other

---

"fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed in the following cases for reference where defendants also entered the Capitol through the broken window adjacent to the Senate Wing Door. However, it is notable that Ivey was one of the very first rioters to enter through the breached window, at approximately 2:13 PM, well in advance of any of the defendants described below.

In *United States v. Doyle*, 21-cr-324-TNM, the defendant also entered through a broken window at approximately 2:23 PM, and subsequently stayed in the Capitol building for at least 24 minutes. *See Doyle*, ECF 27 (government's sentencing memorandum). Doyle was captured on

video chanting near a law enforcement officer and photographed the destruction near the scaffolding on the West Front. The government requested two months of home confinement, three years of probation, and 60 hours of community service. Doyle was sentenced to 2 months' probation.  While Ivey was not captured on video chanting near a law enforcement officer, he was captured on video standing directly against a police line prior to advancing on the Capitol. Further, he watched the smashing out of the window and was one of the very first rioters to enter the U.S. Capitol, entering a full ten minutes prior to Doyle. Finally, Ivey spent more time in the Capitol than Doyle.

In *United States v. John Lolos,* 21-cr-243-APM, the Defendant also entered through a broken window at the Senate Wing Door. *See* ECF 32 (government's sentencing memorandum). Lolos stayed in the Capitol for 43 minutes while chanting at U.S. Capitol police and left only after being confronted by Officers. He was captured on video yelling "They left! We did it!" Lolos sent text messages proclaiming that he was "storming the Capitol" and texted a photo of himself with the caption "[m]e after the battle." Lolos has a prior conviction for threatening to kill someone. The government requested one month of incarceration. Lolos was sentenced to 14 days' incarceration. By contrast, Ivey has no such prior violent convictions, and the investigation did not identify any communications by Ivey celebrating the riot or destruction. Ivey, however, directly observed the window smashing, was one of the first rioters to enter through the breached window, and destroyed evidence after the riot.

In *United States v. Sean Cordon*, 21-cr-269-TNM, and *United States v. Kevin Cordon,* 21-cr-277-TNM, the Defendants also entered through a broken window at the Senate Wing Door at approximately 2:25 PM, while wearing light body armor and carrying a gas mask. Sean Cordon traveled with his brother Kevin Cordon to attend the rally and they entered the Capitol together.

The Cordon brothers were in the Capitol for only five minutes. After exiting the Capitol, Kevin Cordon was interviewed by the press and stated that he was there to "take back our democratic republic. . . This is just the beginning. . . we're gonna show that we have power[.]" Both expressed contrition during their debriefs. Sean Cordon pleaded guilty to Section 5104(e)(2)(G) and the government requested three months' home detention, three years' probation and 60 hours of community service for Sean Cordon. Sean Cordon was sentenced to 2 months' probation. Kevin Cordon was sentenced on one count of 18 U.S.C. § 1752(a)(1). The government requested 30 days' imprisonment and one year' supervised release. Kevin Cordon was sentenced to 12 months' probation. On one hand, Ivey's case stands in fairly stark contrast from the Cordons as Ivey did not wear body armor or carry a gas mask and did not give incendiary and threatening statements to the press after the riot. On the other hand, Ivey was present for the smashing of the window, entered 12 minutes prior to the Cordons, and stayed in the U.S. Capitol for 30 minutes longer than the Cordons.

In *United States v. Brandon Miller and Stephanie Miller*, 21-cr-266-TSC, the Defendants also entered through a broken window at approximately 2:56 pm, they publicly broadcast their entry over Facebook Live, and made post-riot statement showing pride in their actions. *See Miller et al.*, ECF 49, 50 (government sentencing memoranda). The government requested 3 months' home detention for Brandon Miller and he was sentenced to 20 days' jail. The government requested 2 months' home detention for Stephanie Miller and she was sentenced to 14 days' jail. In contrast to the Millers, Ivey was present at the police line and present when the Senate Wing Door window was smashed out and entered nearly 45 minutes prior to the Millers. Further, Ivey deleted evidence after the riot.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.    Combining Incarceration and Probation

The sentence requested by the government—14 days of incarceration followed by three years of probation—is a lawful one. A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense, such as the crime at issue in this case. *See* 18 U.S.C. § 3561(a)(3). In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### a.  *A sentence imposed for a petty offense may include both incarceration and probation.*

#### i.  Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984),

*codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[5] followed by a term of probation, such as the sentence requested by the United States here.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[6] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or

---

[5] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part V(b) *infra*.

[6] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

(3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

## ii.   Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result"

could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in*

*conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty

offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for three reasons. First, Section 3551(a) notes that the sentencing provisions described there apply "[e]xcept as otherwise specifically provided." Section 3561(a)(3) does "provide[]" "otherwise": it recognizes a carveout for petty offenses.

Second, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). When Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). *See supra*, at 23 (recounting statutory history). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Ibid.*

Third, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict

constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Ibid.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147-CKK, Doc. 70 at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991, *see supra*, at 23, does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).

30

Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Here, Ivey pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

### b. *A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.*

#### i. Relevant Background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[7]

    ii.  <u>Analysis</u>

A sentencing court may impose one or more intervals of imprisonment up to a year (or, as here, up to the six-month statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[8]  Such a sentence would be appropriate for Ivey here.

---

[7] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

[8] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Bryan Wayne Ivey to 14 days of incarceration, 3 years of probation with the condition that the defendant receive psychological treatment, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:  *Leslie a. Goemaat*
LESLIE A. GOEMAAT
MA Bar No. 676695
Assistant United States Attorney
Fraud Section

33

U.S. Attorney's Office
555 4th Street, N.W., Room 5840
Washington, D.C.  20530
Office: 202-803-1608
Leslie.Goemaat@usdoj.gov